**Nick SCHIMPF, Helen Schimpf, Frank Schimpf, Bonnie Schimpf, and S & R Egg Farm, Inc., Plaintiffs,**

v.

**GERALD, INC. and Charles F. Marino, Administrator of The Estate of Edward F. Keiser, Defendants.**

No. 97–C–545.

United States District Court, E.D. Wisconsin.

May 14, 1999.

James Culhane, Milwaukee, WI, for plaintiffs.

Janice Rhodes, Milwaukee, WI, Patrick Hodon, for defendants.

## DECISION AND ORDER

ADELMAN, District Judge.

On March 31, 1997, plaintiffs filed this lawsuit against Edward Keiser and Gerald, Inc. Plaintiffs asserted that Keiser conspired with Michael Schwarzmann, a relative of the individual plaintiffs, to defraud plaintiffs of substantial money. In their Amended Complaint, plaintiffs alleged that Keiser (1) violated the Wisconsin Organized Crime Control Act ("WOCCA"), Wis. Stat. §§ 946.80–946.88; (2) engaged with Schwarzmann in a civil conspiracy to defraud; and (3) negligently misrepresented certain facts to plaintiffs; thereby entitling plaintiffs to both compensatory and punitive damages. According to plaintiffs, Gerald is liable under the respondeat superior doctrine because at all times material, Keiser was acting within the scope of his employment.

In a Decision and Order dated April 24, 1998, the estate was substituted for Keiser on the conspiracy and negligent misrepresentation claims. I dismissed the WOCCA claim against Keiser, however, finding that as a penal cause of action the claim expired when Keiser did and thus the estate could not be substituted on that count. I declined, though, to dismiss the count against Gerald at that time just because the claim against Keiser abated, although I suggested that the punitive nature of a WOCCA claim raised questions regarding the applicability of the respondeat superior doctrine.

I have diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs, and it is between citizens of different states.[1] And, as I determined previously, venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(2). (*See* Decision and Order of 4/24/98 at 30–31.)

Defendants have each filed a motion for summary judgment. Because of the numerous issues presented by the parties and time constraints due to the fast-approaching trial date, I am issuing my Decision and Order in two parts. Matters not addressed today will be addressed in another decision early next week.

■ Before delving into the facts of the case, though, some evidentiary motions must be decided, as they affect what I will consider regarding summary judgment. In deciding a motion for summary judgment, I may consider only evidence that is admissible at trial. *Gustovich v. AT & T Communications, Inc.*, 972 F.2d 845, 849 (7th Cir.1992).

## I. MOTION TO EXCLUDE KEISER'S DEPOSITION TESTIMONY

Keiser died on July 18, 1997, and obviously cannot give present testimony to

---

1. Although diversity jurisdiction in regard to Bonnie Schimpf and Frank Schimpf is discussed further below, it is undisputed that I

have diversity jurisdiction over the claims of Nick Schimpf, Helen Schimpf, and S & R.

support plaintiffs' lawsuit. He once, however, was deposed about the events of this case.

On September 3, 1992, plaintiffs filed a lawsuit against Schwarzmann (the "Schwarzmann case"), alleging that Schwarzmann defrauded plaintiffs of over $1 million. Keiser and Gerald were not parties to the lawsuit, and plaintiffs did not then allege that either Keiser or Gerald committed any wrongdoing. In connection with the Schwarzmann case, though, plaintiffs deposed Keiser on January 19, 1994, at which time Keiser was no longer a Gerald employee. At the deposition, Keiser was represented by attorney Jane Lowdon, who also was an attorney for Gerald. No one other than Lowdon, plaintiffs' attorney, and Schwarzmann's attorney attended or participated in the deposition.

Plaintiffs now seek to introduce Keiser's 1994 deposition testimony into evidence against Gerald in the present lawsuit for purposes of the summary judgment motions and trial. Gerald objects, arguing that under Federal Rule of Evidence 804(b)(1). Keiser's deposition testimony is inadmissible hearsay. Plaintiffs retort that parts of the deposition testimony are not hearsay at all and that not only is the testimony admissible under 804(b)(1), but it qualifies under Federal Rules of Evidence 804(b)(3) and 807 as well.[2]

■ Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c). Hearsay that does not fall within an exception in the Federal Rules of Evidence is inadmissible for summary judgment motions as well as trial. *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742–43 (7th Cir.1997).

Here, Gerald attempts to exclude as hearsay Keiser's entire deposition prior to trial. But whether a statement is inadmis-

sible hearsay often hinges on the purpose for which it is offered. *United States v. Linwood*, 142 F.3d 418, 424–425 (7th Cir.) (if statement offered without reference to the truth of the matter asserted, the hearsay rule does not apply), *cert. denied,* —— U.S. ——, 119 S.Ct. 224, 142 L.Ed.2d 184 (1998). As indicated above, when statements are not offered to prove the truth of the matter asserted, they are not hearsay at all. *Id.;* Fed.R.Evid. 801(c).

■ Plaintiffs contend that parts of Keiser's deposition will be offered for purposes other than for their truth. For example, Keiser testified that Schwarzmann told Keiser he had taken money from people and spent it all on a woman and that Schwarzmann told Keiser he wanted to fake the balance in his account at Gerald. According to plaintiffs, these statements will be offered to show that Keiser had knowledge that Schwarzmann's investments with Gerald were suspicious yet helped Schwarzmann plan how to deceive Nick and Gorecki. Testimony by Keiser offered for such purposes does not constitute hearsay. *See* Fed.R.Evid. 801(c); 5 Jack V. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 804.04[1][c] (2d ed. 1997 & Supp.1999) (prior testimony need not meet the requirements of Rule 804(b)(1) if it satisfies some other hearsay exception, qualifies for admission under Rule 801, or is used in a nonhearsay way such as for impeachment or to refresh recollection). Therefore, to the extent that plaintiffs do on summary judgment and will at trial offer Keiser's testimony for purposes other than the truth of the matters asserted, Gerald's motion to exclude the deposition testimony will be denied.

As to statements possibly offered for their truth, under Federal Rule of Evidence 804(a)(4) Keiser is unquestionably

---

**2.** Plaintiffs do not dispute that because Keiser was not employed by Gerald when he gave his deposition, his testimony does not constitute a party admission by Gerald under Federal Rule of Evidence 801(d)(2)(D). The estate, I note, has not moved to exclude the deposition testimony, for good reason: Federal Rule of Evidence 801(d)(2)(A) (a party's own statement is not considered hearsay if offered against the party himself).

an unavailable witness. When a witness is unavailable former testimony is not excluded by the hearsay rule "if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." Fed.R.Evid. 804(b)(1). Rule 804(b)(1) incorporates a concept of fairness by "screen[ing] out those statements, which although made under oath, were not subject to the scrutiny of a party interested in thoroughly testing [their] validity." *United States v. Pizarro,* 717 F.2d 336, 349 (7th Cir.1983).

Gerald contends that neither it nor any predecessor in interest had an opportunity and similar motive to develop Keiser's testimony on two issues key to the present case against Gerald: Keiser's own involvement in Schwarzmann's scheme and whether Keiser was acting within the scope of his employment. Plaintiffs respond that Gerald did in fact attend the deposition through the presence of Lowdon and had both opportunity and motive to develop Keiser's testimony on these points.

Lowdon's exact capacity is somewhat unclear. Plaintiffs present evidence that in December 1992 Lowdon responded on behalf of Gerald to a subpoena seeking documents in plaintiffs' Schwarzmann case. In a letter to plaintiffs' counsel dated September 17, 1996, she wrote:

> As you may be aware, this office represents Gerald, Inc. in connection with various commodity related matters.

> Your office certainly should be aware of this fact as Gerald, Inc., through the undersigned, has cooperated fully with your firm and appropriate authorities relating to the *Schwarzmann* matter in the past.

> Please be advised that my office continues to represent Gerald, Inc. in connection with this matter. Please further

be advised that all future correspondence should be directed to my attention at the address listed above.

(Culhane Aff.Ex. D.) Lowdon even agreed to accept service of the summons and complaint in the current case on Gerald's behalf. Therefore, it appears that she represented Gerald from at least December 1992 to late 1996, including the date of Keiser's 1994 deposition. Gerald submits an affidavit from Lowdon in which she says Keiser himself contacted her for representation at the deposition and that she did, in fact, represent Keiser, not Gerald, at the deposition.[3] Regardless, though, it is true that because Lowdon was also Gerald's attorney regarding any involvement in the Schwarzmann case, it is possible to consider Gerald as having had some type of unofficial presence at the deposition.

In regard to some key issues in the present case, however, I nevertheless cannot say that Gerald or its attorney had an opportunity and similar motive at the Keiser deposition to develop the testimony.

> The touchstone of admissibility is a similar motive to develop the testimony on the part of the nonoffering party (or a predecessor in interest in a civil case). The way to determine whether or not motives are similar is to look at the issues and the context in which the opportunity for examination previously arose, and compare that to the issues and context in which the testimony is currently proffered. The similar motive inquiry is essentially a hypothetical one: is the motive to develop the testimony at the prior time similar to the motive that would exist if the declarant were produced (which of course he is not) at the current trial or hearing?

3 Stephen A. Saltzburg, et al., *Federal Rules of Evidence Manual* 1833 (7th ed.1998).

Just because Lowdon also was Gerald's attorney at the time she attended the de-

---

**3.** Plaintiffs speculate, though, that Gerald paid Lowdon's bill for her work in defending

Keiser at the deposition.

position does not mean she could abandon her simultaneous allegiance and duty of loyalty to Keiser. (It is unclear whether Gerald and Keiser signed any waiver of the conflicts in Lowdon's representation—or even whether any conflicts were apparent at the time.) While on the issue of Keiser's involvement in Schwarzmann's scheme Keiser and Gerald possibly could have had a similar interest in developing the record, as Keiser's attorney Lowdon, however, could not attack or develop Keiser's testimony on the issue of whether he was acting outside the scope of his employment. Keiser's motivation would not have been to show that he alone was on the hook for any damages and liability for involvement in the Schwarzmann scheme, but that his employer was as well, in order to spread the liability. Gerald, on the other hand, had every reason to question Keiser with the aim to show he was acting outside of the scope of his job.

■ This assumes, of course, that Keiser and Gerald even realized that the issues of Keiser's involvement and the scope of his employment needed to be developed at the time. "Mere naked opportunity to cross-examine is not enough; there must also be a perceived real need or incentive to thoroughly cross-examine at the time of the deposition." *United States v. Feldman,* 761 F.2d 380, 385 (7th Cir.1985) (internal quotation marks and citation omitted). The testimony must "be 'subject to the scrutiny of a party thoroughly interested in testing its validity.'" *Id.* at 387 (quoting *Pizarro,* 717 F.2d at 349).

In *Feldman,* two criminal defendants, Feldman and Martenson, successfully blocked the introduction under Rule 804(b)(1) of a deceased former coworker's deposition testimony in a prior civil case brought by the Commodity Futures Trading Commission. Feldman and Martenson had been named as defendants in the civil case about their company, but neither had any exposure to personal liability—one had severed his ties with the company and one was willing to let the government agency obtain the declaratory and injunctive relief

it sought—and thus did not attend the coworker's deposition. Unbeknownst to the two, prior to the deposition their former coworker, Sanburg, had agreed with the government to testify against them in return for a promise that he himself would not be a target of later criminal proceedings. Sanburg subsequently died. No criminal charges were filed against Feldman and Martenson for ten months after the deposition, and the government did not disclose its agreement with the deponent for almost a year.

The Seventh Circuit found on appeal of Feldman's and Martenson's convictions, that for purposes of Rule 804(b)(1) Feldman and Martenson had neither the opportunity nor sufficient similarity of motive to develop Sanburg's testimony in the prior civil proceedings. At the time of Sanburg's deposition, Feldman and Martenson were not adverse parties to Sanburg and had no reason to believe that Sanburg would later testify against them. The two had little personal or financial stake in the civil litigation and therefore understandably did not attend Sanburg's deposition; in the later criminal proceeding, however, they faced fines and imprisonment. Questions by the company's trustee in bankruptcy did not count as cross-examination on behalf of Feldman and Martenson. The trustee was more interested in the movement of assets than in discrediting or attacking Sanburg, "which would have been of utmost importance to the co-defendants." *Feldman,* 761 F.2d at 387.

> In short, no one at the Sanburg deposition had the requisite stake in the proceeding that would be necessary for them to be deemed a predecessor in interest to the criminal defendants, and those who did have the requisite stake had no reason to suspect that they should be there.

*Id.* The deposition thus failed to pass the test of Rule 804(b)(1). *Id.*

■ The facts of this case are similar to those of *Feldman.* At the time of Keiser's deposition, Keiser and Gerald had not even

been sued by the plaintiffs; plaintiffs were then pursuing only Schwarzmann. Gerald, which was not sued until two and half years later, had no reason to suspect that it should nor sufficient motive to officially attend and cross-examine Keiser at the deposition. At the time of the deposition it was not even aware that it would be in an adverse position to Keiser at a later date (regarding the issue of whether Keiser acted within the scope of his employment). In other words, given that neither Keiser nor Gerald were defendants in the Schwarzmann case and had not yet been sued in this case, and that the focus of the Schwarzmann case was on Schwarzmann alone, any similarity of motive between Lowdon at the time of Keiser's deposition and Gerald in the present case completely dissipates.

Plaintiffs and Schwarzmann obviously were not motivated similarly to present-day Gerald either. As a result, I find that Keiser's deposition testimony is not admissible former testimony under Rule 804(b)(1).

Federal Rule of Evidence 807 provides a residual exception from the hearsay rule:

A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

Plaintiffs argue that because Keiser's deposition is offered as evidence of material facts, many of which were raised first by Gerald itself, the evidence is more probative on the point than any other evidence plaintiffs can procure, and the interests of justice will best be served by admission of the statement, I should deem the deposition testimony admissible under Rule 807.

Another court within this district has found that the general Rule 807 does not apply, however, when a more specific hearsay rule actually deals with a certain situation. *Acme Printing Ink Co. v. Menard, Inc.*, 812 F.Supp. 1498, 1527 (E.D.Wis.1992) (noting that testimony generically of a type covered by another specific hearsay exception, but which fails to meet the precise requirements of that exception, should not be admitted under the rule). The text of Rule 807 basically says as much. A statement must have "equivalent circumstantial guarantees of trustworthiness." A statement that almost meets a subsection of Rule 804 but fails cannot have equivalent guarantees of trustworthiness as a statement that meets all the requirements—otherwise Rule 804 would have allowed it. Various commentators agree. According to Saltzburg, *supra,*

[i]t is clear ... that the intent of the drafters was that the exception would be sued sparingly; the concern was that overuse of the residual exception would undermine the categorical approach to the hearsay exceptions set forth in the Federal Rules....

... A broad application of the residual exception could permit the case-by-case exception to swallow the categorical rules.

Saltzburg, *supra,* at 1931. "The residual hearsay exception was meant to be reserved for exceptional cases. It was not intended to confer a broad license on trial judges to admit hearsay statements that do not fall within one of the other exceptions contained in rules 803 and 804(b)." Weinstein, *supra,* § 807.02[1] (internal quotation marks omitted); *see also United States v. Dent,* 984 F.2d 1453, 1465–66 (7th Cir.1993) (Easterbrook, J. and Bauer, C.J., concurring) (arguing that because grand jury testimony is covered by the exception for prior testimony, residual exception cannot be used as a means for admission).

That is the case here. Rule 804(b)(1) addresses former testimony from a person now dead. Keiser's deposition testimony

does not qualify under Rule 804(b)(1) and therefore should not get in through the back door of Rule 807.

■ Various courts, though, have read Rule 807 more broadly. *See, e.g., United States v. Earles,* 113 F.3d 796, 799–800 (8th Cir.1997) (statement may be considered for admission under residual exception even if statement is of type addressed by specific hearsay exception but does not qualify for admission under that exception); *United States v. Clarke,* 2 F.3d 81, 83 (4th Cir.1993) (residual exception "rejects formal categories in favor of a functional inquiry into trustworthiness, thus permitting the admission of statements that fail the strict requirements of the prior exceptions, but are nonetheless shown to be reliable"). Even under this broader interpretation of Rule 807, however, I choose to exclude Keiser's deposition testimony because I am not satisfied that it has "equivalent circumstantial guarantees or trustworthiness" nor that the general purposes of the evidence rules and the interests of justice are best served by its admission. Although Keiser was under oath at his deposition, he was not heavily cross-examined at all by anyone attending. Further, plaintiffs are arguing two inconsistent positions. They assert in the present case that Keiser intentionally conspired to cover up Schwarzmann's fraud and improperly and intentionally used his employer's stationery and statement forms to assist Schwarzmann, but also argue that Keiser's statements under oath in 1994 are reliable. And finally, as stated above, Keiser's posture then of being a witness in the Schwarzmann case differs greatly from the posture in which Gerald, as Keiser's former employer, now finds itself. For all of these reasons, I am unconvinced that admission under Rule 807 is warranted.

Nevertheless, Keiser's deposition testimony, or at least certain parts of it, may be admitted under Rule 804(b)(3). Rule 804(b)(3) provides that the hearsay rule does not exclude

[a] statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability ... that a reasonable person in the declarant's position would not have made the statement unless believing it to be true.

The guarantee of reliability for declarations against interest "is the assumption that persons do not make statements which are damaging to themselves unless satisfied for good reason that they are true." Fed.R.Evid. 804 advisory committee's note; *Williamson v. United States,* 512 U.S. 594, 599, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994).

■ A statement against interest as defined in Rule 804(b)(3) is admissible against a declarant's codefendant. Once it is determined that testimony is excepted from the general prohibition against hearsay by virtue of Rule 804(b)(3) a plaintiff is able to use a declarant-codefendant's extrajudicial statements against interest against the nondeclarant-codefendant as well. *United States v. Hamilton,* 19 F.3d 350, 355–56 (7th Cir.1994). That is especially true in a case like this one, where the nondeclarant-codefendant's liability is predicated solely on the doctrine of respondeat superior.

■ Keiser may have made some such statements. He testified, for instance, that he verified an account balance for Nick and Gorecki shortly after Schwarzmann deposited a check for a substantial amount of money, which itself occurred soon after Schwarzmann had asked Keiser how to fake an account balance and Keiser said the way to get money in the account was to deposit a check and see if it clears. Said Keiser: "Obviously he gave me a wooden check to get the balance to look good so I would authenticate it in front of the uncle and his CPA, which I did do.... I didn't mention the check. I didn't mention anything." (Keiser Dep. at 103–04.) Taken together, these very well may be statements against interest.

It does not follow, however, that the entire deposition transcript is admissible.

On the contrary, statements that do not incriminate Keiser will not be admitted under this rule. *See Williamson,* 512 U.S. at 599–602, 114 S.Ct. 2431 (the exception applies only to individually self-inculpatory statements; neutral or self-serving portions of a broader narrative that is generally self-inculpatory are not admissible under the rule); *Carson v. Peters,* 42 F.3d 384, 386 (7th Cir.1994) (portions of inculpatory statements that pose no risk to declarant "are just garden variety hearsay"); Weinstein, *supra,* § 804.06[4][d][ii] ("statement" as used in "statement against interest" refers not to declarant's entire narrative but only to the parts of it that inculpate defendant). I must apply a statement by statement approach. *See Williamson,* 512 U.S. at 599–604, 114 S.Ct. 2431.

Gerald's current motion, however, only attacks Keiser's deposition as a whole, and its objections to proposed findings of fact based upon Keiser's deposition refer only to Rule 804(b)(1). Moreover, "whether a statement is self-inculpatory or not can only be determined by viewing it in context," *Williamson,* 512 U.S. at 603, 114 S.Ct. 2431, which the parties have not had the chance to address. Any decision as to the exclusion of particular portions of Keiser's testimony therefore must await more specific objections by Gerald at trial. My factual summary below, therefore, will include these statements.[4]

## II. MOTION TO STRIKE OTHERS' TESTIMONY REGARDING KEISER

Gerald next asks that I declare plaintiff Nick Schimpf ("Nick") and witness Schwarzmann incompetent to testify about their alleged communications and transactions with Keiser and strike any such testimony from the record, including the summary judgment materials. Keiser's estate did not join in the motion. It did, however, join in the portion of Gerald's reply brief in which Gerald objects to numerous statements by Schwarzmann and Nick based on their incompetency to testify. I therefore will treat the motion as if it were brought by and the decision applies to the estate as well.

Federal Rule of Evidence 601 provides that when state law applies to an element of a claim, the competency of a witness to testify regarding that element also is determined in accordance with state law. The parties agree that Wisconsin law applies to all claims in this case, so I look to Wisconsin law to determine Nick's and Schwarzmann's competency.

 Wisconsin still has what is commonly referred to as a "dead man's statute." Under Wis.Stat. § 885.16

[n]o party or person in the party's or person's own behalf or interest, and no person from, through or under whom a party derives the party's interest or title, shall be examined as a witness in respect to any transaction or communication by the party or person personally with a deceased or insane person in any civil action or proceeding, in which the opposite party derives his or her title or sustains his or her liability to the cause of action from, through or under such deceased or insane person.... [5]

4. Because Keiser's statements are admissible against the estate, I would include them in the factual summary in any event for purposes of deciding the estate's motion for summary judgment.

5. Wisconsin Statute § 885.17, which extends § 885.16 to transactions the party has had with an agent of the adverse party when that agent is deceased, also may apply:

No party, and no person from, through, or under whom a party derives his interest or

title, shall be examined as a witness in respect to any transaction or communication by him personally with an agent of the adverse party or an agent of the person from, through or under whom such adverse party derives his interest or title, when such agent is dead....

The parties, however, focus only on § 885.16 and in this case § 885.17 adds little to the discussion.

*See also* Wis.Stat. § 906.01 ("Every person is competent to be a witness ·except as provided by [§§ ] 885.16 and 885.17."). Therefore, in order to render an otherwise competent witness incompetent under the dead man's statute, a party must show that: (1) there was a transaction or communication between the decedent and the witness; (2) the witness has an interest in the matter at hand; and (3) the liability or cause of action of the party advocating incompetence arose from, through or under the deceased. *Havlicek/Fleisher Enters., Inc. v. Bridgeman,* 788 F.Supp. 389, 397 (E.D.Wis.1992). An interested survivor not only is incompetent to testify about a course of conduct between himself and the deceased that may constitute a transaction, but he also may not testify regarding conduct between himself and the deceased that may provide the basis for an inference that a transaction occurred. *Johnson v. Mielke,* 49 Wis.2d 60, 71, 181 N.W.2d 503 (1970).

▮ The dead man's statute stems from the common law belief that a party to a case has a powerful temptation to misrepresent the transaction or communication he had with a deceased person, who obviously cannot rebut the testimony. *Havlicek/Fleisher,* 788 F.Supp. at 396–97. Because of the Wisconsin Supreme Court's feeling that the statute rests upon an archaic view of the law—that one who has an interest in a controversy should not be allowed to testify—it has mandated that the statute must be strictly construed: "Were·the rule simply one of common law its pernicious effect would long ago have dictated its abolition. Since it is a rule of statutory law, the courts have merely been able to alleviate the harshness of the rule by insisting upon exceptionally strict rules for its invocation." *Long v. Molay (In re Estate of Molay),* 46 Wis.2d 450, 459, 175 N.W.2d 254 (1970); *see also State v. Fonk's Mobile Home Park & Sales, Inc.,* 133 Wis.2d 287, 298, 395 N.W.2d 786 (Ct. App.1986) (court stated it was reading § 885.16 strictly, citing *Molay* ).

Plaintiffs do not dispute that element (3) above is satisfied: Gerald's potential liability arises through respondeat superior because of its employment of Keiser. The dispute instead focuses on item (1) in regard to Nick, i.e. whether he personally was involved in a transaction or communication, and item (2) in regard to Schwarzmann, i.e. whether he has· an interest that disqualifies him.

## A. Nick Schimpf: Transaction or Communication.

The only specific factual situation involving Nick that the parties note in their motion papers as being at issue is a meeting on September 20, 1991 in Chicago between Nick, Keiser, Schwarzmann, and Nick's accountant Dan Gorecki. Nick, Gorecki, and Schwarzmann went to Chicago to meet Keiser at Nick's own request and insistence, to check on his supposed financial investments made with Gerald through Schwarzmann.

Plaintiffs do not dispute that Nick meets element (2) of the test of the dead man's statute—that he has an interest in the current proceedings that could disqualify him from being competent to testify about Keiser's acts and statements. (*See* R. 100 at 4–5.) Instead, they assert that in regard to this particular meeting, Schimpf was a mere bystander and witness to a transaction between Keiser and Gorecki.

"Transaction" as used in § 885.16 means "a personal transaction with the deceased; a transaction in which each is an active participant[;] ... a mutual transaction between the deceased and the surviving party, one in which they both actively participate." *Seligman v. Orth,* 205 Wis. 199, 206, 236 N.W. 115 (1931). The statute "does not prohibit the survivor from· describing an event or physical situation, or the movements or actions of a deceased person, quite independent and apart, and in no way connected with, or prompted or influenced by reason of, the conduct of the party testifying." *Id.* Further, the statute does not forbid testimony regarding transactions or communications between the deceased· and third persons, though in the

witness's presence, if the witness did not participate in the transaction and the participants were not affected by the witness's presence: "Unless the transactions or communications are personal, and had with the deceased by the party, either literally or in practical effect, as by participating in or influencing them, they do not fall under the prohibition of the statute." *Wollman v. Ruehle,* 104 Wis. 603, 607, 80 N.W. 919 (1899); *see Havlicek/Fleisher,* 788 F.Supp. at 397 ("a witness to these transactions or communications is competent to testify as to their substance if he was not a party to the transaction and did not influence it in any way."). The reason: the dead man's statute was apparently intended to offset an interested party's lack of objectivity; therefore, when a witness has no interest in the outcome of the transaction, he or she has no reason to conceal or lie about facts surrounding it. *See id.*

According to Nick's testimony, at the September 1991 meeting he did not himself speak with Keiser: "I didn't ask nothing of Mr. Keiser. I did not talk to him. Mr. Gorecki . . . was talking and Mike and myself, we were standing on the side here and we weren't talking." (Nick Dep. at 84.) Plaintiffs contend that because Nick was merely listening to a conversation that was solely between Keiser and Gorecki and no way influenced the conversation, he is competent to testify regarding the substance of the conversation.

■ Plaintiffs' argument is unconvincing. Gorecki was not conversing with Keiser regarding his own affairs, but instead spoke with Keiser as Nick's accountant and agent. Moreover, notwithstanding that Gorecki was at the meeting and spoke solely because he was working on Nick's behalf, any argument that the Gorecki/Keiser conversation was "independent" of and "in no way connected with, or prompted or influenced by" Nick's presence and conduct is untenable. Nick, Gorecki, and Schwarzmann went to Chicago to meet Keiser at Nick's own request and insistence, to check on Nick's own investments, and to ease Nick's own mind about his money. The entire transaction and conversation thus was prompted by and was solely aimed at satisfying Nick. Nick was in no way as disinterested as the bystander witness in *Wollman,* who merely listened as a transaction occurred and "in no wise participated in or influenced the proceedings, so far as appears." *Wollman,* 104 Wis. at 607, 80 N.W. 919.

As a result, the dead man's statute applies to render Nick incompetent to testify about the September 20, 1991 transaction involving Keiser in Chicago. As in connection with its motion Gerald provides no other specific factual situation to which Nick may be incompetent to testify, my granting of the motion to strike regarding Nick's testimony is limited to just that September 20, 1991 transaction.

## B. Michael Schwarzmann: Disqualifying Interest

Gerald's objection to Schwarzmann's competency is not tied to any particular or specific transaction or communication, but that is immaterial for present purposes because plaintiffs' retort is not based on whether he was personally involved in any transaction but whether he has any interest in the current matter that disqualifies him.

■ The dead man's statute renders a witness incompetent "only when the witness is a party, or is a person from, through or under whom a party derives his interest, or is a person who will be testifying in his own behalf or interest while offering such testimony for a party." *Bethesda Church v. Menning (In re Estate of Christen),* 72 Wis.2d 8, 11, 239 N.W.2d 528 (1976). The test of a disqualifying interest of the witness "is whether he or she will gain or lose by the direct legal operation and effect of the judgment, or that the record will be legal evidence for or against him [or her] in some other action." *Fonk's,* 133 Wis.2d at 298, 395 N.W.2d 786; *see also Johnson,* 49 Wis.2d at 74, 181 N.W.2d 503. The interest must "be realized (a gain or loss) by the effect

and direct legal operation of the judgment on the cause in issue." *Christen,* 72 Wis.2d at 13, 239 N.W.2d 528. "The interest must be present, certain and vested, and not an interest uncertain, remote, or contingent." *Fonk's,* 133 Wis.2d at 298, 395 N.W.2d 786 (internal quotation marks and citation omitted).

■ Gerald contends that Schwarzmann is an interested party because plaintiffs, who in 1992 sued Schwarzmann for fraud concerning the same losses they now attribute to Keiser and Gerald as well, have a judgment against Schwarzmann for over $1 million and have not yet collected on the judgment. According to Gerald, if plaintiffs prevail in this case, because Gerald (unlike Schwarzmann) is capable of paying a judgment, Schwarzmann's liability to plaintiffs will be reduced, because plaintiffs cannot recover twice for a single loss. Gerald contends that this interest of Schwarzmann is direct, present, and vested, and that a gain or loss for Schwarzmann is tied directly to this case.

I disagree. Because the dead man's statute must be construed strictly, courts have held fast to the idea that a disqualifying interest must be direct, present, certain, and vested. For instance, a mere employee has been found to have too remote an interest to prevent him from testifying under § 885.16. *Havlicek/Fleisher,* 788 F.Supp. at 401. In *Johnson,* a witness was allowed to testify about a decedent's communications and transaction regarding retitling of a bank account into the name of the witness's mother-in-law. The witness "had no right or interest in that account during decedent's lifetime, nor could he receive any interest in it under any judgment rendered in this action." *Johnson,* 49 Wis.2d at 72, 181 N.W.2d 503. In *Christen,* the Supreme Court of Wisconsin found that the husband of a woman incompetent to testify because of her interest in proceeds from a contested will was not himself incompetent to testify. *Christen,* 72 Wis.2d at 11–13, 239 N.W.2d 528. The court summarized similar cases where a daughter was competent to testify in support of her mother's claim against an estate and a mother was allowed to testify in a proceeding to determine her children's status as heirs of a decedent, because the "interests" were too speculative for purposes of the statute. According to the court the reception of property by the wife could have no effect on what the witness inherited or received down the road, even assuming that he survived and remained married to her. *See id.* at 12–13, 239 N.W.2d 528.

Like the situations discussed in *Christen,* here a judgment against Gerald would not directly and automatically result in reduced liability for Schwarzmann; such a judgment will only directly favor plaintiffs. Any benefit for Schwarzmann would occur only remotely or contingently down the line. In order for Schwarzmann to get any benefit from a judgment by plaintiffs against Gerald, Gerald first would have to pay completely, then Schwarzmann would have to apply for relief from the judgment against him, and Schwarzmann would have to obtain a court finding that any payments by Gerald should be credited to the judgment against him. At issue will be whether and to what extent any damages between the two cases overlap. Plaintiffs' case against Schwarzmann involved Schwarzmann's actions commencing in 1987, long before any alleged conspiracy involving Keiser. And in the current case, plaintiffs have alleged a violation of the Wisconsin Organized Crime Control Act (WOCCA), Wis.Stat. §§ 946.80 – 946.88, which can trigger double damages and punitive damages. The case cited by Gerald, *Tuchalski v. Moczynski,* 152 Wis.2d 517, 449 N.W.2d 292 (Ct.App.1989), for the proposition that "the law of judgments requires satisfaction of both judgments if one is paid," *id.* at 520, 449 N.W.2d 292, clearly involved one same loss. That is not the case here, where it is possible that the damages adjudged against Schwarzmann may indeed differ from those possibly to be adjudged against Gerald. Because current Wisconsin law expresses disdain for the dead man's statute, I am obliged to

construe it narrowly and limit is application wherever possible. Interpreting the dead man's rule narrowly, I cannot deem Schwarzmann incompetent to testify based on this one-satisfaction-of-judgment argument proffered by Gerald.

■ In addition, however, says Gerald, Schwarzmann has an interest in whether Gerald is liable for intentional as opposed to negligent misrepresentations by Keiser. According to Gerald, if it is found vicariously liable for negligent misrepresentations by Keiser, Gerald will have a claim against Schwarzmann for contribution or indemnity. On the other hand, if Gerald is found vicariously liable for intentional misrepresentations or fraud by Keiser, it will not have such a claim, as there is no right to contribution or indemnity between intentional tortfeasors. *See Fleming v. Threshermen's Mut. Ins. Co.*, 131 Wis.2d 123, 129, 388 N.W.2d 908 (1986); *Jacobs v. General Accident Fire & Life Assurance Corp.*, 14 Wis.2d 1, 5, 109 N.W.2d 462 (1961). Schwarzmann, says Gerald, thus has a strong interest in making it look like Keiser acted intentionally. Further, Gerald asserts, the record in this case will be used in any lawsuit brought by Gerald against Schwarzmann for contribution—either by Gerald to establish that Schwarzmann and Keiser were joint tortfeasors, or by Schwarzmann to establish that Gerald is collaterally estopped from relitigating the issue of Keiser's intent.

In *Fonk's*, several persons were found competent to testify even though a judgment for the plaintiff state would require Fonk's to make restitution to all Wisconsin residents who suffered pecuniary loss due to Fonk's actions, possibly including the witnesses at issue.

> [S]uch restitution can only be obtained if a witness or other affected person makes a claim to a special master or magistrate, who will "determine if a vio-

lation occurred as to that tenant and, if so, the pecuniary loss which accrued from said violation." These are facts not determined by the trial court here. The trial court's findings of fact and conclusions of law contained no express findings that any or each of the individual transactions between Fonk, Sr. and individual witnesses constituted violations in themselves, nor were specific damages found.

> The trial court's decision does not preclude a finding by a special master or magistrate that as to any individual witness here no violation occurred or no pecuniary loss resulted. It is for each tenant to satisfy the fact finder that as to him or her a violation actually occurred. The restitution interest of these witnesses is at best contingent.

> Neither will the record in this case "be legal evidence" for these witnesses in the restitution proceedings or any private action brought against Fonk's by any of these witnesses. The witnesses are just that; they are not parties to this action. Although the traditional rule requiring mutuality of parties for an assertion of collateral estoppel has been modified to allow defensive use of collateral estoppel to prevent a party from relitigating, "by merely switching adversaries," an issue already exclusively resolved against that party, . . . offensive use of collateral estoppel has not yet been allowed in Wisconsin.[6] As a result, the record and findings here are not evidence establishing the witnesses' individual claims against Fonk's.

*Fonk's*, 133 Wis.2d at 298–99, 395 N.W.2d 786 (citations omitted, footnote added).

■ Defensive collateral estoppel, or issue preclusion, occurs when a defendant seeks to prevent a plaintiff from asserting a claim that the plaintiff has previously

---

**6.** Since *Fonk's* issued, the Supreme Court of Wisconsin, however, *has* recognized the adoption in Wisconsin of offensive use of collateral estoppel. *Michelle T. by Sumpter v. Crozier*, 173 Wis.2d 681, 495 N.W.2d 327 (1993). Of-

fensive collateral estoppel occurs when a plaintiff seeks to foreclose a defendant from litigating an issue the defendant has previously litigated unsuccessfully in an action with a third party. *Id.* at 684 n. 1, 495 N.W.2d 327.

litigated and lost against another party. *Michelle T. by Sumpter v. Crozier*, 173 Wis.2d 681, 684 n. 1, 495 N.W.2d 327 (1993). The parties agree that if in this case Keiser, and thus Gerald, is found liable based upon Keiser's intentional misrepresentations, Gerald will have no claim for contribution against Schwarzmann. Gerald essentially will be defensively collaterally estopped from litigating that issue—if it were to bring a claim for contribution against Schwarzmann, as a defense Schwarzmann would be able to assert that Gerald previously fully litigated the issue of negligent misrepresentation versus fraud and lost. In addition, if Keiser, and thus Gerald, is determined to be a joint tortfeasor with Schwarzmann based upon negligence, the testimony at trial in this case, could be used to support a summary judgment motion regarding a finding for Gerald in any later contribution case against Schwarzmann. The judgment in this case as to whether Keiser's actions are determined to have been intentional rather than negligent creates a present and vested, as opposed to remote, interest in this case. Therefore, Schwarzmann too is incompetent to testify about his transactions and communications with Keiser.[7]

### III. REQUEST TO STRIKE AFFIDAVIT OF MAGIDSON

In support of its motion for summary judgment, Gerald provided the affidavit of Michael Magidson. Plaintiffs say I should strike Magidson's affidavit. Gerald submitted a second affidavit of Magidson with its reply brief, but plaintiffs have not filed any objection to the second affidavit.

Plaintiffs request is based on three separate reasons. The first, according to plaintiffs, is unfair surprise and prejudice and failure to follow the Local Rules. Gerald did not list any of its employees in its answers to mandatory interrogatories as having knowledge of any fact alleged in the complaint, even though it had a continuing obligation to do so under Local Rule 7.07(c). Neither did Gerald list Magidson as one of the forty-seven witnesses listed in its September 1998 responses to plaintiffs' requests for discovery, nor in any supplementation thereafter. Plaintiffs have not had an opportunity to depose Magidson and feel that his first presence as a witness at this late date is highly prejudicial.

■ While it is a close call, I decline to strike the affidavit based upon unfair surprise and failure to strictly follow the rules and name Magidson in responses to mandatory or other discovery. Although Magidson may not have personal knowledge regarding the alleged conspiracy itself between Keiser and Schwarzmann, his testimony regarding Gerald's internal policies and rules is related enough to Gerald's defense that Keiser was acting outside of the scope of his employment to trigger the duty to disclose Magidson, or a similar witness, in responses to discovery. Nevertheless, I do not believe that plaintiffs could truly be surprised or prejudiced by finding out at this late time that Gerald, operating in the highly-regulated field of securities and commodities, had internal policies aimed at preventing fraud. Because I am admitting Magidson's affidavit, however, in fairness I will allow plaintiffs to depose Magidson if possible prior to trial.

■ Next, say plaintiffs, Magidson's affidavit fails to comply with Federal Rule of Civil Procedure 56(e), which requires that the policies and rules discussed there-

---

7. I note that Gerald's final contention—that Schwarzmann has not yet been sentenced for criminal activity relating to this case and will be able to use the record in this lawsuit "to bargain for a lighter jail sentence," (R. 102 at 5–6)—relates to an entirely speculative as opposed to direct and vested interest. It assumes that the sentencing judge will consider the outcome here—basically whether Keiser was at fault—somehow relevant in assessing Schwarzmann's culpability for mail fraud. Schwarzmann's actions stand on their own, however, and Gerald has not convinced me that any outcome here will play any role in a sentencing determination as to Schwarzmann's conduct.

in be attached. According to Magidson's second affidavit, submitted with Gerald's reply brief, Gerald cannot produce a copy of the policies because they were burned in a warehouse fire in October 1996. Such a reason, involving no intentional conduct by Gerald to avoid the requirements of Rule 56(e), is sufficient in my opinion to excuse Gerald from the Rule. Gerald cannot be faulted for its inability to produce the written rules based upon such an event.

Third, plaintiffs assert, the affidavit is hearsay. It also refers only to the year 1989, not the time period of 1990–1992 during which the alleged conspiracy took place. The date problem is one of interpretation. Magidson's first affidavit contained the year 1989 in one paragraph but no date references in later paragraphs. Any confusion, however, is corrected by Magidson's second affidavit, in which he indicates that he was an executive vice-president, secretary, and director of Gerald from 1989 through 1998 and has knowledge of Gerald's activities during that period.

In regard to the hearsay objection, not all of the affidavit can possibly be hearsay. For instance, Magidson's statement for purposes of summary judgment that "Edward Keiser was employed as a broker for Gerald in 1989 when Schwarzmann opened his account," (First Magidson Aff. ¶ 6), is not a statement other than one presently made by the declarant, thus it is not hearsay at all. Some statements do sound like hearsay (for example, those indicating what the National Futures Association Compliance Rules state), but plaintiffs have not attacked all of the suspect sentences. They point specifically only to Magidson's statements regarding the provisions of Gerald's internal policies.

■ I am unconvinced that Magidson's statements about Gerald's internal policies are hearsay. Magidson does not say that "Gerald had certain written policies in a handbook, which read or stated as follows. . . ." Instead, he says what Gerald's policies actually were. I am presently unconvinced that an existing policy is itself any type of statement. In general, a policy is what it is, whether it is put into a written document for all employees to read or not. While more developed argument on the point may be made in the future, at this time I am unconvinced that Magidson's recitation of Gerald's internal policies is hearsay and therefore I am going to deny without prejudice the request to strike these particular statements pursuant to the hearsay rules. In regard to any other statements in the affidavit that are possible hearsay, although specific objections may be made at trial, I am not going to parse the affidavit today and the request will be denied without prejudice as well in regard to hearsay objections.

■ Finally, contend plaintiffs, the affidavit contains conclusory and speculative testimony as to what Gerald would have done under certain circumstances and legal opinions regarding fines that could have been imposed upon Gerald for Keiser's alleged activities.[8] In this regard I agree with plaintiffs. The object of Rule 56(e) is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit. *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990); *Weeks v. Samsung Heavy Indus.*

8. For instance, Magidson states in his affidavit:

If Gerald had permitted such activity [by Schwarzmann regarding opening an account], Gerald could have been fined by the National futures Association ("NFA") for violating NFA Compliance Rule 2–30 which mandates that Gerald obtain the names of the individuals depositing money at Gerald for futures trading. In addition, Gerald

could have been fined as much as $100,000 by the NFA for violating Bylaw 1101 which generally prohibits the pooling of resources by undisclosed individuals for future trades. (First Magidson Aff. ¶ 5.) He also states that "[i]f Keiser had committed such acts, he would have been asked to resign by Gerald" and that "if Keiser had entered into such a conspiracy, he would have been discharged." (*Id.* ¶¶ 10 & 14).

*Co.*, 126 F.3d 926, 934 (7th Cir.1997). "Self-serving assertions without factual support in the record will not defeat a motion for summary judgment." *Jones v. Merchants Nat'l Bank & Trust Co.*, 42 F.3d 1054, 1058 (7th Cir.1994). Without any factual support regarding what level of oversight the National Futures Association had over Gerald and what types of internal policing and disciplinary procedures existed at Gerald itself, Magidson's predictions of certain fines and personnel actions that could or would have occurred are indeed conclusory speculation, on which I will not rely in making my decision regarding summary judgment.

## IV. FACTUAL BACKGROUND

Proceeding to the summary judgment motions themselves, the following facts are undisputed unless otherwise noted or else are taken in the light most favorable to plaintiffs.

Plaintiffs Nick, Helen Schimpf ("Helen"), Frank Schimpf and Bonnie Schimpf ("Bonnie") are relatives who all live in Wisconsin. No one disputes that they are Wisconsin citizens as well (for purposes of 28 U.S.C. § 1332). Plaintiff S & R Egg Farms, Inc., of which Nick is the majority shareholder and president, is a Wisconsin corporation, with its principal place of business in Wisconsin as well.

At all relevant times, defendant Gerald, Inc. was a New York corporation, with its principal place of business in New York. Until the close of business on January 15, 1993, Gerald had an office in Chicago, Illinois, which engaged in the business of buying and selling commodities futures for customers on commodity exchanges, including the Chicago Board of Trade. Gerald formerly employed Edward Keiser as a vice president of accounts at its Chicago office. Keiser was a resident of Illinois (no one disputes that he was a citizen of Illinois as well). Keiser died on July 18, 1997. (Defendant Estate of Edward Keiser has since been substituted for Keiser.)

In 1985 Schwarzmann, who is Nick and Helen's nephew and Frank Schimpf's cousin, persuaded his parents, Frank Schwarzmann and Eve Schwarzmann ("Eve"), to give him money to invest in the stock and commodities market. Schwarzmann told his parents that he could earn good returns on their money. Relying on Schwarzmann's representations, Frank Schwarzmann and Eve gave their son over $14,000 to invest in 1985. Schwarzmann invested his parents' money through a brokerage account at either Ira Epstein or Charles Schwab & Co.

Schwarzmann initially had some success when he invested his parents' money and each month he returned the profit on his trades to his parents. After a while, however, Schwarzmann lost his parents' entire investment when he gambled and invested their money in one bad trade. Afraid to tell the truth, Schwarzmann did not tell his parents that he lost their money. Instead, he assured them that their investments were doing well, hoping they would invest additional money with him so that he could recoup their losses. Meanwhile, to keep up the appearance that his trades were profitable, Schwarzmann continued returning money to his parents each month under the pretext that it was profit. Relying on Schwarzmann's assurances, Frank Schwarzmann and Eve gave their son additional money to invest in 1986. Again, Schwarzmann invested the money through a brokerage account at either Ira Epstein or Charles Schwab & Co. Once again, however, Schwarzmann lost his parents' money by making poor investments.

In 1987 Schwarzmann convinced several members of the Schimpf family including Nick, Helen, Bonnie and Frank Schimpf—to invest money with him. Nick, at least at the time of this first investment, trusted Schwarzmann and knew that Schwarzmann's parents had given money to Schwarzmann to invest.

Schwarzmann told the Schimpfs that he was running an investment fund and that their money would be invested at Gerald in Chicago. Schwarzmann, though, at that time had no investment fund, let alone any

account in Chicago or at Gerald. Instead of investing the Schimpfs' money, Schwarzmann used most of it in 1987 to pay for his personal living expenses (as he had no job) and to continue returning money to his parents. What money Schwarzmann did invest was invested and lost through a brokerage account at either Ira Epstein, Charles Schwab & Co. or Lind–Waldock and Company.

Although Schwarzmann had converted most of the Schimpfs' money and lost the remainder investing, Schwarzmann assured the Schimpfs that their investments were doing well. To add some credibility to his assurances, Schwarzmann provided the Schimpfs with phony account statements purporting to show that their investments were I doubling and tripling.

The Schimpf family members gave Schwarzmann additional money in 1988. Again, Schwarzmann converted some of the money he received from them in 1988 to pay for his personal living expenses; he also purchased some real estate, which Schwarzmann hoped to subdivide and develop. What money Schwarzmann did invest in 1988, he again invested and lost at Ira Epstein, Charles Schwab or Lind–Waldock and Company.

In 1988 Schwarzmann began returning money as supposed profit to Nick. At first I Schwarzmann returned only a few thousand dollars to Nick each month. Then, as months passed, Schwarzmann returned increasingly larger amounts to make it appear as if Schwarzmann's trades were successful. By January 1990, Nick was receiving approximately $43,000 from Schwarzmann each month. Although Nick claims he thought these payments were profit and not partial repayments of his principal, he did not report it as income to the Internal Revenue Service.

By returning these "profits" Schwarzmann hoped to encourage Nick to invest even more. Schwarzmann's ploy worked, as Nick gave Schwarzmann $525,500 in 1989. Based on Schwarzmann's continued representations that their investments were doing well, other Schimpfs also poured more money into Schwarzmann's so-called fund in 1989. Once again Schwarzmann used the money he received from the Schimpf family to pay for his personal living expenses; he also developed land that he owned. Schwarzmann continued returning money to his parents and Nick, although it is disputed I whether it was under the guise of a profit as opposed to an understood return of principal.

Nick, as it happens, was not investing money belonging only to himself and Helen. A $200,000 chunk of what he invested belonged to Mathias and Rose Reger, a couple living across the street from Nick's second house in Florida, who provided investment money based on Nick's representations about Schwarzmann's investment skills.

In May 1989 Schwarzmann opened a trading account at Gerald. Schwarzmann opened the Gerald account in his own name, although it is disputed whether at that time Schwarzmann told Gerald he was investing others' money in the account. Plaintiffs, through the affidavit of Michael J. Armitage, say Keiser knew at the time Schwarzmann opened the account that Schwarzmann was investing others' money.[9] Gerald, through Magidson, indicates that its internal policies expressly prohibited the opening of an I account in the name of one individual with money belonging to

---

9. In its reply brief, responding to plaintiffs' proposed findings of fact, Gerald (and Keiser's estate by adoption) objected to all statements in the Armitage affidavit relating to prior statements made by Keiser to Armitage. Plaintiffs hired Armitage to investigate their monetary losses, and in connection with his investigation Armitage interviewed Keiser. But while objecting to Armitage's statements as hearsay, Gerald and the estate have failed to move to strike them, and, as these objections first appeared in the reply brief, plaintiffs have had no opportunity to address the hearsay issue. Therefore, I will consider Armitage's statements at this time, but put plaintiffs on notice that the statements may be excluded at a later date if I find that they are indeed hearsay.

third parties. Schwarzmann never had any relationship with Gerald before opening the account at Gerald in May 1989.

At the time Schwarzmann opened his account and thereafter, Keiser was a broker with the title of vice-president, working at Gerald on a commission basis and receiving a certain percentage of the commissions paid to Gerald by customers whose accounts he handled. Gerald received a commission on each trade. Early on in their relationship, Schwarzmann told Keiser that Schwarzmann had control of, or was managing a large commodities fund.[10] Keiser was leery of Schwarzmann, but was interested in the! commissions Schwarzmann could generate.

Keiser went out drinking with Schwarzmann on several occasions. According to plaintiffs' proffered evidence, Schwarzmann had several conversations with Keiser about how to raise or handle money illegally, including laundering money, kidnapping, borrowing money from a bank using bad collateral, and using fraudulent warehouse receipts. Further, Keiser was aware that Schwarzmann was attempting to forge warehouse receipts to obtain money fraudulently.[11] Schwarzmann at some point told Keiser that Schwarzmann had taken money from various individuals and had spent it.

By early spring 1990 Schwarzmann ran out of cash. Without cash he no longer could return money to his parents, Nick, or the Regers to maintain the illusion that he was making money on his alleged trades. When Schwarzmann stopped re-turning money, Frank Schwarzmann and Eve immediately complained to their son, asking why he had stopped sending checks. Schwarzmann told them that he could no longer return money because he was "having financial difficulties." When Frank Schwarzmann and Eve asked what the financial difficulties were, Schwarzmann explained that he had "purchased some land" and that he "was paying other people back." Schwarzmann warned his parents that they could not get their money back for a year. As a result, Frank Schwarzmann and Eve became concerned.

Nick also called and complained to Schwarzmann when his checks stopped; he also wanted to withdraw some funds to buy a car. In response, at some point Schwarzmann told Nick that Nick's money was still invested where it was supposed to be but that the money was invested in a fund and he had a problem getting at it. But during a telephone conversation sometime between January and March 1990 Schwarzmann told Nick that he could not get his money back for seven years because Schwarzmann had done something wrong. When asked, at trial of an action brought by the Regers against Nick and Schwarzmann, when he first realized Schwarzmann was committing some sort of scam, Nick replied:

> Well, I realized it, I think in '90, in January, February, March, somewhere in there, because we didn't get any checks no more. And I said, Mike, what is going on? Well, he said, I did something wrong, and I got to wait for seven

---

**10.** The evidentiary back-up for this statement is a statement by Keiser at his deposition. As noted above only portions of Keiser's deposition may end up being admissible at trial. But *until specific objections and argument are heard* regarding the statement against interest exception, and because the statements are admissible against the estate for purposes of its summary judgment motion, I am including Keiser's statements here.

**11.** I note that the basis for several of the proposed findings of fact proffered by plaintiffs is questionable. For instance, Armitage states that Keiser was leery of Schwarzmann and aware Schwarzmann was attempting to forge warehouse receipts. (*See id.* ¶¶ 137 & 138.) Statements of lay witnesses are admissible only if based on personal knowledge or inferences grounded in observation or other first-hand personal experience. *Gustovich,* 972 F.2d at 849–50. How this witness can vouch for Keiser's thoughts and actions is curious, but defendants have not presently moved to strike the evidence or findings. As a result, again, I will consider them for present purposes, assuming that at trial plaintiffs would have a better way of presenting these facts.

years, otherwise they're going to throw me in jail.

I said, Mike, where is the money? It's invested at Gerald, Inc. And I asked him, I said, Mike can we see that money? Oh, yes.

(Trial Test. of Nick in *Reger v. Schwarzman*, No. 94–4616–CA–01 (Fla.Cir.Ct. (12th Cir.) Mar. 11, 1996) at 155–56.)

When Nick asked what the "problem" was that prevented Schwarzmann from returning Nick's money for seven years, Schwarzmann said that he was dealing with the Chicago mafia and that Nick could not get his money until Schwarzmann's dealings with the mob had concluded. Schwarzmann told Nick to "keep quiet" about the problem and Schwarzmann's mob dealings, and Nick agreed to do so. Nick did not ask Schwarzmann why the mafia connection would prevent him from getting his money back for seven years or who the Chicago mafia members were. During this time, Schwarzmann otherwise never told any of his family members that he had lost their money.

In the spring of 1990, the Regers also became concerned and asked Nick why Schwarzmann had stopped sending them checks. Nick told the Regers that there was a I problem, but refused to divulge its nature or anything about Schwarzmann's mob dealings and inability to repay investors for seven years. When the Regers insisted on knowing what the problem was Nick said he could not tell them but that they should not worry; the Regers did not become suspicious, however.[12]

Plaintiffs allege that on March 2, 1990, Schwarzmann either met with or spoke to Keiser, although I note that they cite to no competent evidence for that fact. Schwarzmann says that in April of 1990 he began preparing phony Gerald account statements by doctoring up legitimate Gerald statements that he had received or forging account statements using blank forms he had.

At some point, apparently in early 1990, Nick's and S & R's accountant, Dan Gorecki, became concerned that the money invested at Gerald was solely in Schwarzmann's name; he expressed this concern to Schwarzmann. Schwarzmann told Gorecki that he was working with attorneys, including a Paula Doyle, to bring the funds into compliance and put the accounts in the name of each investor. Schwarzmann asked Doyle to call Nick and assure him that the investments were going well. Although Doyle says she was never asked to do so, Gorecki says Doyle later communicated to him that she was working to make sure the investments were set up properly and that the name change of the fund would be made on August 1, 1990. In a letter dated June 15, 1990, Doyle wrote to Nick as follows:

Somewhat more than half the four-month period of April 1 to August 1 has elapsed since we talked in early April, at which time you agreed to leave your funds in your nephew, Michael Schwarzmann's, MSI Fund without intervening profit disbursement until the fund is officially dissolved on August 1, 1990. I know that this action was a sacrifice on your part, and now that several months have passed since our talk, I wanted to write to you with the re-assurance that all matters are proceeding smoothly toward the full dissolution of the fund on August 1.

I am instructing Michael to provide you with all appropriate brokerage statements governing the fund should you wish to see them. If before August 1 you might have any concerns about the fund or your assets in it, I believe that these statements should lay these fears to rest. By any standard of the investment industry, this fund has been superbly profitable. Your nephew has great talent, as I am sure you know better than I.

12. The Regers later obtained a judgment for breach of an oral contract against Nick in Florida in connection with the money they invested with Schwarzmann. Nick has paid the judgment.

Michael has told me that you were able to secure possession of your Mercedes in spite of the inconvenience which you were put to in early April, and I trust that since that time you have been doing your driving in properly accustomed comfort and style.

(R. at 91 Ex. D.) After this letter, Nick or someone on his behalf asked Schwarzmann to I supply copies of the brokerage statements.

Schwarzmann's so-called fund was, not changed or dissolved on August 1, 1990, however. Schwarzmann, though, started giving Nick statements with a sub-account number, which Schwarzmann represented was assigned to Nick. To Gorecki, Keiser confirmed Schwarzmann's explanation regarding the creation of the sub-accounts and explained the reason the money was frozen. Gorecki learned at some point that Schwarzmann had signed some type of fraudulent receipt and that a certain amount of time needed to pass before Schwarzmann could safely change the status of the investments—Schwarzmann was concerned that if he made a change, an audit would I reveal that he had done something wrong.

Keiser agreed to write a letter to Gorecki, whereby it would appear that Schwarzmann had $400,000 in his account at Gerald.

Also in the summer of 1990, partly due to the urging of her brother, Nick, Eve telephoned Keiser to check on her investment.[13] Although Eve did not inquire as to the exact amount in the account, Keiser assured her that "the money was there," even though there was no money in the account at that time. Eve then told Nick about Keiser's assurances.

In late 1990 and early 1991 Stephen I. Derfel, Schwarzmann's accountant, was preparing a certified audit of Schwarzmann's financial statement. Keiser sent Gerald account statements to Derfel, spoke to Derfel three or four times on the telephone, and falsely told Derfel that Schwarzmann had over $1.5 million in his account at Gerald as of December 31, 1990.[14] Derfel relied on the information received from Keiser in preparing the audited financial statement, which incorrectly showed a Gerald account balance of over $1.5 million.

Throughout 1990 Nick repeatedly complained to Schwarzmann and asked for his money back. Each time Nick asked for his money back, Schwarzmann offered some new excuse as to why he could not get it.

Nick eventually received $5,000 from Schwarzmann on November 30, 1990 and $25,000 on January 31, 1991. On February 5, 1991, Schwarzmann assigned $642,000 in proceeds from the sale of real estate to Nick, although the assignment apparently never resulted in any proceeds. Schwarzmann's lawyer prepared a release for Nick to sign to release claims Nick had against Schwarzmann; it is unclear whether Nick signed it, as no one remembers. A few months later Schwarzmann returned another $30,000 to Nick. Nick did not report the money he recovered from Schwarzmann as investment income in his income tax returns.

In March 1991 Keiser met with Eve and Frank Schwarzmann in Chicago in the I lobby of Gerald's office building, at which time Keiser showed them a statement indicating there was over $1.5 million on account in Schwarzmann's name. Nick

---

**13.** Gerald objects to plaintiffs' proposed findings of fact regarding this conversation between Eve and Keiser based upon the dead man's statute. No motion to exclude this evidence has been made, however, and, as Eve is no longer a plaintiff in this case, on the record before me I currently see no interest on her part in the current proceedings. Therefore, her testimony will be considered.

**14.** Once again, although in response to plaintiffs' proposed findings of fact Gerald objects to Derfel's statements as being hearsay, plaintiffs have had no opportunity to address the objections. Therefore Derfel's statements will be considered for purposes of the present motions. I assume, however, that at trial the admissibility of these statements will be addressed.

learned that Eve and Frank Schwarzmann had visited Keiser in Chicago and Keiser had told them there was about $1.5 million in the account.

Gorecki, who had been Nick's accountant for fifteen years, had regular meetings every three or four months with Schwarzmann and Nick to discuss the status of Nick's and S & R's investments. At these meetings, Schwarzmann produced faked Gerald documents, which were discussed among the parties present, and by telephone with Keiser, although it is disputed whether Keiser knew the documents were fakes. Keiser and Gorecki spoke about the status of Nick's and S & R's investments in Gerald on at least two or three occasions.

In the fall of 1991, Gorecki was auditing S & R's books. To verify the amount of S & R's investment at Gerald, Nick, Gorecki, and Schwarzmann met with Keiser at the Gerald offices in Chicago on September 20, 1991.[15] Schwarzmann had told Keiser ahead of time that they were coming and asked how he could make it appear as if he had a large amount of money invested at Gerald. Keiser told him he could deposit a check with Gerald and the check would be credited to his account and that Schwarzmann could later stop payment on the check. Schwarzmann thereafter gave Keiser a check for $441,500, for which he had insufficient funds in his bank account.

At the September 20 meeting in Chicago, Keiser gave Gorecki, Nick and Schwarzmann a statement showing that Schwarzmann's account had a market value of $481,766.60. Keiser said the funds could be liquidated at any time, although he knew that there were insufficient funds in Schwarzmann's account to pay the check. Keiser falsely told the visitors that Schwarzmann had other accounts at Gerald and that Eve and Frank Schwarzmann's account was segregated.

Schwarzmann closed the Gerald account on October 1, 1991, when he withdrew all the money.

Schwarzmann later asked Keiser to launder money that Schwarzmann intended to obtain as ransom for a kidnapping. Keiser told Schwarzmann that he would do so.

In April 1992 Schwarzmann was arrested for attempted kidnapping. He apparently planned to kidnap a relative and obtain ransom to cover his "investment" hijinks. After his arrest, however, his investment scam could no longer be concealed. According to plaintiffs' proposed findings of fact, this was the first time Nick, Bonnie, and Frank Schimpf learned that their money was not invested at Gerald.[16] When Gorecki called Keiser after Schwarzmann's arrest to find out the status of the investments; Keiser told him that the money was gone "before the door closed behind you that day." Keiser told Gorecki the plaintiffs had been "scammed" and apologized to Gorecki.

Schwarzmann pled guilty to mail fraud in connection with the scam in 1995 and I currently awaits sentencing.

Frank Schimpf and Bonnie Schimpf gave $24,000 to Schwarzmann, although they concede that only $6,000 of it was invested and lost after March 2, 1990, the initial date of the alleged conspiracy between Schwarzmann and Keiser to cover up Schwarzmann's fraud.

Nick and Helen gave Schwarzmann a total of $945,200 between 1988 and 1992. Of those funds, $200,000 belonged to the Regers. Between 1988 and 1991 Schwarzmann returned approximately $522,000 to Nick. Accordingly, Nick and Helen's alleged out-of-pocket losses total about $223,000. They concede that they invested only $204,500 with Schwarzmann on or after March 2, 1990, however, and it ap-

15. As Schwarzmann's and Nick's statements regarding this transaction with Keiser have been struck, the facts regarding this meeting come from the depositions or affidavits of Gorecki, Armitage, and Keiser.

16. Plaintiffs' proposed findings of fact do not indicate when Helen learned of the scam.

pears that $68,000 of the $522,000 was returned to them after March 2, 1990. At his deposition Nick admitted that he began relying on acts in furtherance of the alleged conspiracy no earlier than March 1990. Nick first spoke to Keiser in September 1991. At his deposition Nick Schimpf admitted that he only relied on Keiser himself when he gave $62,700 to Schwarzmann in 1991 and 1992.

At the direction of Nick, S & R Egg Farm gave $578,000 to Schwarzmann between 1988 and 1992. S & R concedes, however, that it invested only $370,000 with Schwarzmann on or after March 2, 1990.

Other Schimpf family members gave Schwarzmann about $100,000 over the course of the investment scam. It is unclear how much Frank Schwarzmann and Eve gave their son, but it appears to have been between $250,000 and $325,000. Between 1985 and 1991 Schwarzmann returned about $200,000 to his parents, however.

For purposes of the summary judgment motions it is undisputed that Schwarzmann did actually invest some of the money received from the plaintiffs after March 1990 at Gerald, resulting in Gerald's receipt of some commissions.

In September 1992 Nick, Helen, Frank Schimpf and Bonnie, together with S & R and the other relatives who were formerly a part of this case, brought the Schwarzmann case, suing Schwarzmann in Waukesha County Circuit Court for defrauding them of over $1 million. As alluded to above in regard to Schwarzmann's disqualifying interest under the dead man's statute, the plaintiffs in the Waukesha County case subsequently obtained a default judgment against Schwarzmann, but have been unable to collect.

Plaintiffs filed this case in Walworth County Circuit Court on March 31, 1997; defendants removed it to this court on May 8 of that year. In addition to the

current plaintiffs, this case was brought by plaintiffs' relatives Alfred Schimpf, Edith Schimpf, Ernest Schimpf, Christine Schimpf, Helga Schimpf–Heizmann, John Heizmann, and Frank Schwarzmann and Eve. All of these other relatives were dismissed from the case pursuant to a stipulation by the parties and order dated January 20, 1999.[17]

Plaintiffs alleged that Keiser conspired with Schwarzmann to cover up Schwarzmann's fraud by: (1) falsely assuring Eve in the summer of 1990 that her funds were invested with Gerald and that her investment was safe; (2) providing Schwarzmann with blank Gerald statements to use to create fictitious account statements; (3) falsely assuring Frank Schwarzmann and Eve that their investments were safe when he met them at Gerald's Chicago office on March 21, 1991; (4) falsely representing the value of Schwarzmann's account during telephone conversations with Derfel in January 1991; (5) writing a letter on January 23, 1991 that falsely represented the value of Schwarzmann's account; (6) writing a letter to Derfel on August 15, 1991 that falsely indicated Schwarzmann had $483,000 at Gerald; and (7) falsely misrepresenting the value of Schwarzmann's account during the meeting with Nick and Gorecki in Chicago on September 20, 1991.

## V. SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party has the initial burden of demonstrating that it is entitled to summary judgment. *Id.* at 323, 106 S.Ct.

---

**17.** Defendants' motions for summary judgment were brought prior to the dismissal of these parties and therefore addressed their claims. Thus, as to claims of the dismissed plaintiffs, the motions for summary judgment will be denied as moot.

2548. Once this burden is met, the non-moving party must designate specific facts to support or defend each element of the cause of action, showing that there is a genuine issue for trial. *Id.* at 322–24, 106 S.Ct. 2548.

In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The mere existence of some factual dispute does not defeat a summary judgment motion, however; "the requirement is that there is a *genuine* issue of *material* fact." *Id.* at 247–48, 106 S.Ct. 2505.

"Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chicago,* 119 F.3d 1286, 1291 (7th Cir.1997). Failure to support any essential element of a claim renders all other facts immaterial. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. Therefore, summary judgment is appropriate against a party who, after adequate time for discovery and in the face of a properly supported summary judgment motion, fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Id.* at 322, 106 S.Ct. 2548.

Whether a material issue of fact is "genuine" necessarily requires some qualitative determination of sufficiency of the evidence. To defeat a properly supported motion for summary judgment, the opposing party must present specific and sufficient evidence that, if believed by a jury, would actually support a verdict in its favor. Fed.R.Civ.P. 56(e); *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. A "metaphysical doubt as to the material facts" is insufficient to defeat a motion for summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Regensburger v. China Adoption Consultants, Ltd.,* 138 F.3d 1201, 1205 (7th Cir.1998). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348. "A district judge faced with [a summary judgment] motion must decide ... whether the state of the evidence is such that, if the case were tried tomorrow, the plaintiff would have a fair chance of obtaining a verdict. If not, the motion should be granted and the case dismissed." *Palucki v. Sears, Roebuck & Co.,* 879 F.2d 1568, 1572–73 (7th Cir.1989) (citations omitted).

Where a decision turns on the credibility of a witness, however, summary judgment is not appropriate. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505 ("[c]redibility determinations ... are jury functions, not those of a judge.").

## VI. ANALYSIS REGARDING SUMMARY JUDGMENT

### A. Subject Matter Jurisdiction Over Claims of Bonnie and Frank Schimpf

In its reply brief Gerald contends that I have no subject matter jurisdiction over the claims of Bonnie and Frank Schimpf because they concede "that their claim against Gerald, once worth $77,500 ... is now worth only $6,000," failing to meet the jurisdictional minimum. This argument is rejected for two reasons.

First, it was raised, for the first time, in Gerald's reply. "A reply brief shall be limited to matters in reply." Local Rule 6.01(c) (E.D.Wis.). Plaintiffs have not had any opportunity to respond and therefore any motion for summary judgment on this basis would be denied for this reason.

Second, even on the merits, on the record currently before me the motion fails. Whether diversity jurisdiction exists generally is set at the time a complaint is filed. Jurisdiction depends on the state of affairs when the case begins; what happens later is irrelevant. *Gardynski–Leschuck v. Ford Motor Co.,* 142 F.3d 955, 958 (7th Cir.1998) (quoting *St. Paul Mercury*

*Indem. Co. v. Red Cab Co.,* 303 U.S. 283, 289–90, 58 S.Ct. 586, 82 L.Ed. 845 (1938)). In other words, if a complaint alleges damages in excess of the statutory requirement ($75,000, as the case was filed following the effective date of the most recent amendment to the statutory minimum amount), failure to actually recover that amount does not retroactively deprive the district court of jurisdiction. *Id.* But, if it appears that as of the date the case was filed "to a legal certainty ... the claim [was] really for less than the jurisdictional amount," dismissal for lack of subject matter jurisdiction is required. *St. Paul,* 303 U.S. at 289, 58 S.Ct. 586; *Gardynski–Leschuck,* 142 F.3d at 957. The plaintiff gets the benefit of any doubt. *See id.*

Bonnie and Frank Schimpf, however, cannot just tag along on the case brought by Nick and Helen and S & R.

> "It is a familiar rule that when several plaintiffs assert separate and distinct demands in a single suit, the amount involved in each separate controversy must be of the requisite amount to be within the jurisdiction of the district court, and that those amounts cannot be added together to satisfy jurisdictional requirements."

*Anthony v. Security Pac. Fin. Servs., Inc.,* 75 F.3d 311, 315 (7th Cir.1996) (quoting *Clark v. Paul Gray, Inc.,* 306 U.S. 583, 589, 59 S.Ct. 744, 83 L.Ed. 1001 (1939)). Supplemental jurisdiction is not available. *See* 28 U.S.C. § 1367(b) (in a case in federal court solely on diversity grounds "the district courts shall not have supplemental jurisdiction ... over claims by plaintiffs ... when exercising supplemental jurisdiction over such claims would be inconsistent with the jurisdictional requirements of section 1332"). Thus, Bonnie and Frank Schimpf must meet the jurisdictional amounts themselves.

Gerald presents me with no evidence that Bonnie and Frank Schimpf's allegations in their complaint and amended complaint that they were damaged in the amount of $77,500, as the amount they invested with Schwarzmann, plus punitive

damages and double-damages under WOCCA, were not made in good faith or that *at the time the complaint was filed* it was certain that they could not recover that amount. Gerald's current argument regarding jurisdictional amount is disingenuous, as *Gerald* removed this case to federal court, asserting that the amount was met. It too therefore must have believed that the jurisdictional amount was satisfied; accepting its current argument would mean that this case should be remanded—a tactic usually preferred by plaintiffs not defendants. In any event, all Gerald indicates is that *at present* these two plaintiffs' claims for return of their principal outlays (Gerald does not at all address the possible value of punitive damages or damages under WOCCA) equal $6,000 together. That is not ·enough to convince me at this time that the complaint failed to meet the jurisdictional amount. The motion will be denied without prejudice on this matter, however, as the issue of subject matter jurisdiction may be raised at any time.

## B. Choice of Law

Defendants next contend that I should apply Illinois rather than Wisconsin law.

In a diversity jurisdiction case a federal court must apply the law of the state in which it sits, including the rules governing choice of law. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Erie R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Doe v. Roe No. 1,* 52 F.3d 151, 154 (7th Cir.1995). Thus, I look to Wisconsin's choice of law rules to determine whether Illinois or Wisconsin substantive law applies.

Which state's law applies under the conflict of law rules is a pure question of law. *Kuehn v. Childrens Hosp., Los Angeles,* 119 F.3d 1296, 1300 (7th Cir. 1997). Wisconsin employs a two-step analysis for choice of law decisions. *Lichter v. Fritsch,* 77 Wis.2d 178, 182–83, 252 N.W.2d

360 (1977). Step one is to determine whether there is a conflict between the law of the states involved—in other words whether the choice of one law over the other will determine the outcome of the case. *Id.* at 182, 252 N.W.2d 360. If no such conflict exists, the law of the forum applies. *See Ziolkowski v. Caterpillar, Inc.,* 800 F.Supp. 767, 778–79 (E.D.Wis. 1992), *aff'd,* 996 F.2d 1220 (7th Cir.1993). If there is an outcome-determinative conflict the next step is to analyze five items to determine which state's law to apply: (1) predictability of results; (2) maintenance of interstate and international order; (3) simplification of the judicial task; (4) advancement of the forum's governmental interests; and (5) application of the better rule of law. *Id.; Lichter,* 77 Wis.2d at 183–84, 252 N.W.2d 360; *Heath v. Zellmer,* 35 Wis.2d 578, 596, 151 N.W.2d 664 (1967). The appropriate law, unless the above factors clearly displace it, is the law of the forum. *Hunker v. Royal Indem. Co.,* 57 Wis.2d 588, 599, 204 N.W.2d 897 (1973). The purpose of the presumption is "to trigger the responsibility of the court to carry out the forum state's policy unless it appears that the forum state's policies are unaffected by using a nonforum rule, or unless the facts show that the contacts with the tort are so minimal that the use of forum law would be clearly the result of interloping chauvinism." *Conklin v. Horner,* 38 Wis.2d 468, 475 n. 2, 157 N.W.2d 579 (1968).

Defendants' argument for Illinois law is unexpected. In regard to motions for dismissal, which I decided last year, the substantive legal issues presented to me were argued under substantive Wisconsin law, and were thus determined that way as well. The survivability of plaintiffs' WOCCA claims against the defendants was determined solely by Wisconsin law as well. My determination that I had personal jurisdiction over Keiser also applied Wisconsin-law agency principles. *See Schimpf v. Gerald, Inc.,* 2 F.Supp.2d 1150 (E.D.Wis. 1998). Defendants therefore have a hard road to hoe to now convince me that Illinois law applies at this juncture.

Defendants admit that except in regard to the WOCCA claim and plaintiffs' pursuit of punitive damages from Gerald under a respondeat superior theory, "[c]hoice of law will make little difference." (Def. Gerald's Br. in Supp. at 35.) It is clear, however, that a true conflict exists regarding the WOCCA claim. Defendants basically admit that Illinois has no similar law, urging me to dismiss the claim as lacking any legal basis if I apply Illinois law. (*See id.* at 39.) It also appears a conflict may exist over the punitive damages issue, as Illinois follows the "complicity rule," which imposes liability for punitive damages on a corporation only when a superior officer ordered, participated in or ratified the misconduct, while Wisconsin has not yet considered whether to adopt the complicity rule or the "vicarious liability rule," which imposes liability for punitive damages on a corporation for the misconduct of all employees acting within the general scope of their employment. *See Wangen v. Ford Motor Co.,* 97 Wis.2d 260, 291 n. 16, 294 N.W.2d 437 (1980). Whether an actual conflict really exists on the latter issue or whether Wisconsin courts would agree with those in Illinois on the matter is unclear, but immaterial. If no conflict exists, Wisconsin law should apply as the default. And assuming a conflict does exist, I believe Wisconsin law will apply anyway.

Defendants focus mainly on counting the contacts this case has with Illinois. The number of contacts is not decisive, though: "the mere counting of contacts should not be determinative of the law to be applied. It is rather the relevancy of the contact in the terms of policy considerations important to the forum, *vis-a-vis,* other contact states." *Wilcox v. Wilcox,* 26 Wis.2d 617, 633–34, 133 N.W.2d 408 (1965). Defendants then argue only two of the five factors to consider: maintenance of interstate order and advancement of the forum's interest. Consideration of all factors, though, leads to the application of Wisconsin law.

## 1. Predictability of Results

The first factor involves whether the result of an unintended contingency—i.e. the legal consequence of the act—comports with predictions or expectations of the parties. *Lichter,* 77 Wis.2d at 184, 252 N.W.2d 360. Predictability of results has less weight in a tort case than in a contract case, as torts are unexpected. Nevertheless, it can still be considered. *Id.*

Defendants point to the following contacts with Illinois, but do not expound much on their significance: Keiser's alleged acts occurred in Illinois, Gerald's office was in Illinois, Keiser was an Illinois citizen, Keiser's estate is in Illinois, Schwarzmann's account was in Illinois, and Schwarzmann concealed the fraud in Illinois. Keiser also met with Nick and Eve and Frank Schwarzmann in Chicago. Contacts at least equal in quantity and significance point back to Wisconsin, however: plaintiffs and their agents were sometimes located in Wisconsin when conversing with Keiser via telephone or receiving his letters, plaintiffs are Wisconsin citizens and so is Schwarzmann and their interactions occurred mainly in Wisconsin, plaintiffs gave Schwarzmann their investment money in Wisconsin, and Schwarzmann concealed the fraud in Wisconsin as well as Illinois. These Wisconsin contacts at the least swing the pendulum back toward center; thus the nonforum contacts do not have much more significance and thus the presumption of Wisconsin law applies.

In addition, and importantly, the place of a tort for conflicts purposes is not necessarily where the negligent act occurs but where the injury is felt—in this case Wisconsin. *Kuehn,* 119 F.3d at 1301. In *Kuehn*'s conflicts analysis, for instance, Chief Judge Poser described how the negligent act in that case occurred when an extraction of bone marrow was shipped improperly in California, but the injury to the patient occurred when the marrow arrived in unusable form, for only at that point had he been deprived of cells that he needed in order to have a chance of extending his life. As the patient was in Wisconsin then, the Seventh Circuit found that the tortious injury occurred in Wisconsin as well. Here, similarly, although many of Keiser's allegedly negligent or intentional acts may have occurred in Illinois, the injuries to plaintiffs—residents of Wisconsin—occurred in Wisconsin, where their money was taken yet not returned and where they acted detrimentally in reliance on Keiser's actions and representations. Adding this consideration to the above, Wisconsin law is the favored one here.

## 2. Maintenance of Interstate Order

"This criterion requires that a state that is minimally concerned defer to the interests of a state that is substantially concerned." *Lichter,* 77 Wis.2d at 184, 252 N.W.2d 360 (internal quotation marks omitted). "[N]o state should impose its law in a situation when its parochial rules would unduly and without substantial reason so impinge upon another state as to interfere with the free flow of commerce or the exercise of another state's legitimate policies." *Heath,* 35 Wis.2d at 596, 151 N.W.2d 664.

Here, Wisconsin is the home of the alleged victim of the defendants' actions and has an interest in protecting its citizens from the torts of nonresidents. On the other hand, Illinois has a similar interest in seeing that its citizens are not treated contrarily to how they would be treated in Illinois for their actions. Where both states have such substantial interests at stake the "interstate order" criterion drops out. *Kuehn,* 119 F.3d at 1300.

## 3. Simplification of the Judicial Task

As for simplifying the judicial task, if Illinois law applies, barring plaintiffs' WOCCA claim completely, of course the judicial task will be simplified because the merits of the WOCCA claim will never be considered. The Seventh Circuit, however, has stated that it "cannot imagine that such a consideration, systematically favor-

ing defendants, is entitled to significant weight." *Kuehn,* 119 F.3d at 1301. Because I have dealt with WOCCA previously, I find this factor insignificant regarding the WOCCA claim because I am fully capable of applying that law. Although in regard to all other claims other than the punitive damages issue Wisconsin law is slightly favored, *see Heath,* 35 Wis.2d at 597, 151 N.W.2d 664 ("a court's task is rarely simplified when the lawyers and judges must apply themselves to foreign rather than forum law"), I find this factor similarly insignificant, as the parties admit that the law differs little between the two states.

Upon considering the punitive damages issue, however, the scale does tip toward application of Illinois law. As framed by the parties, Illinois courts have adopted the complicity rule, giving me clear guidance on what law applies. Wisconsin courts, though, have not considered whether to adopt the complicity rule or the vicarious liability rule. As a result, I would have to analyze current Wisconsin law and perhaps the law from other states and federal courts to predict what Wisconsin courts would say on the matter.

### 4. Advancement of Wisconsin's Governmental Interest

"[I]t is the duty of a Wisconsin court to identify and effectuate Wisconsin policies." *Heath,* 35 Wis.2d at 597, 151 N.W.2d 664. The question here is "whether the proposed nonforum rule comports with the standards of fairness and justice that are embodied in the policies of the forum law. If it appears that the application of forum law will advance the governmental interest of the forum state, this fact becomes a major, though not in itself a determining, factor in the ultimate choice of law." *Id.* at 598, 151 N.W.2d 664. This factor, though, was almost conclusive in *Heath.*

Here, Wisconsin has a strong interest in obtaining for its residents the measure of relief that the state believes appropriate; or so the Wisconsin courts would probably think. *See Kuehn,* 119 F.3d at 1302. The Wisconsin legislature has de-termined that its citizens should be protected by WOCCA and be entitled to relief pursuant thereto. There is no doubt that this interest will be compromised by application of Illinois law. Further, the Wisconsin courts may very well believe that the vicarious liability rule is proper for determining punitive damages against a corporation. As a result, application of Wisconsin law will advance the forum state's interests.

While Illinois has some interest in limiting the liability of its citizens, that interest is only slight and, when it comes to intentional torts, is not in any way laudable. Defendants concede that Wisconsin's interests are strong: "[i]f there was a true conflict in this case where plaintiffs could recover punitive damages and recover WOCCA damages under Wisconsin law but not recover under Illinois law, then Wisconsin may well have a greater interest in this case than Illinois." (Def. Gerald's Br. in Supp. at 38.) Assuming a true conflict exists, then, this factor weighs in favor of applying Wisconsin law. Even assuming no true conflict exists because plaintiffs have no sustainable WOCCA claim or claim for punitive damages, Wisconsin law applies based on the presumption of forum law in the face of no conflicts. Either way, the result is Wisconsin, not Illinois, law.

### 5. Better Rule of Law

The "better rule of law" is the law that "appears to present the sounder view of the law in light of the socioeconomic facts of life at the time when the court speaks.... the law that most adequately does justice to the parties." *Heath,* 35 Wis.2d at 598, 151 N.W.2d 664. If the law of the other state is outmoded Wisconsin courts "will try to see our way clear to apply our own law instead." *Id.* at 599, 151 N.W.2d 664 (quoting *Clark v. Clark,* 107 N.H. 351, 222 A.2d 205 (1966)).

The parties do not discuss which state's law is better. At most, because applying Wisconsin law furthers the important poli-

cy of protecting an injured party's right to recover under WOCCA and gives an injured party a broader ability to obtain punitive damages to deter future tortious conduct, Wisconsin law can be considered the better rule. At the least, based on the parties' lack of any argument to the contrary, the two states' laws are equally good, and thus the forum law presumption tilts the scale toward applying Wisconsin law.

### 6. Conclusion

] While Illinois law is favored a bit in regard to simplification of the judicial task, that slant is more than outweighed by the heavy interest of Wisconsin in furthering its governmental policies and the favoring of Wisconsin law regarding predictability of results. In addition, as stated above, the appropriate law, unless the above factors clearly displace it, is the law of the forum. *Hunker*, 57 Wis.2d at 599, 204 N.W.2d 897. When all five factors are considered together, the slight favoring of Illinois in the simplification of the judicial task factor in no way clearly displaces Wisconsin law. While I indeed will have to do some more analysis to determine what Wisconsin law will be in regard to inflicting punitive damages upon a corporation, the task appears not to be a complicated or difficult one. In the context of all five factors, I do not give the simplification issue much weight at all. Wisconsin's policies as set forth in WOCCA are greatly affected by using a nonforum rule and Wisconsin's contacts with this case are much more than minimal. As a result, Wisconsin law applies.

### C. Statute of Limitations

Both defendants assert that all of Nick's and S & R's claims are barred by the applicable statute of limitations.

#### 1. Claim of Conspiracy to Defraud

 The plaintiffs' claim of conspiracy to defraud is governed by Wis.Stat. § 893.93(1), which provides that an action based on fraud must be filed within six years of the accrual of the claim. "The cause of action in such case is not deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud." Wis.Stat. § 893.93(1)(b). For purposes of accrual of a fraud claim, however, " 'it is not necessary that a defrauded party have knowledge of the ultimate fact of fraud. What is required is that it be in possession of such essential facts as will, if diligently investigated, disclose the fraud.' " *Stroh Die Casting Co. v. Monsanto Co.*, 177 Wis.2d 91, 117–18, 502 N.W.2d 132 (Ct.App.1993) (quoting *Milwaukee Western Bank v. Lienemann*, 15 Wis.2d 61, 65, 112 N.W.2d 190 (1961)). Ordinarily the date of discovery of a fraud is a question of fact for the jury. *Williams v. Kaerek Builders, Inc.*, 212 Wis.2d 150, 159, 568 N.W.2d 313 (Ct.App.1997).

Because this case was filed in state court on March 31, 1997, plaintiffs' cause of action must have accrued on or after March 31, 1991 in order to avoid the bar. Defendants argue that there is no factual dispute about when Nick, on behalf of himself and as president of S & R, discovered the fraud and that such date was prior to March 31, 1991.

My analysis begins with the central conversation between Nick and Schwarzmann, which occurred sometime between January and March 1990, more than one year before the critical date. I repeat Nick's quote from far above:

> Well, I realized it [that Schwarzmann was committing some sort of scam], I think in '90, in January, February, March, somewhere in there, because we didn't get any checks no more. And I said, Mike, what is going on? Well, he said, I did something wrong, and I got to wait for seven years, otherwise they're going to throw me in jail.
>
> I said, Mike, where is the money? It's invested at Gerald, Inc. And I asked him, I said, Mike can we see that money? Oh, yes.

(Trial Test. of Nick in *Reger v. Schwarzmann*, No. 94–4616–CA–01, (Fla.Cir.Ct. (12th Cir.) Mar. 11, 1996) at 155–56.)

Schwarzmann then went on to tell Nick about his mafia dealings and problems and told Nick he could not get to his money until Schwarzmann's dealings with the mob had concluded. Nick then agreed to keep quiet about that matter.

Defendants contend that Nick's and S & R's claims accrued right then and there or, at the latest, by February 1991, by which time Nick had repeatedly called Schwarzmann to ask for his money back and requested that Schwarzmann's fund be dissolved through Paula Doyle without success. By then, say defendants, Nick had plenty of information by which to be suspicious and was in possession of all essential facts that would have, if diligently investigated, disclosed the fraud. According to defendants,

> [b]y the end of 1990, nine months after Schimpf realized he had been scammed and after a succession of broken promises and payments missed, any conscientious person should have become suspicious of Gerald's alleged role since Schimpf's money was allegedly at Gerald. Yet, Schimpf made no attempt to contact Gerald. Any attempt to withdraw his money would have uncovered the fraud he now alleges and avoided any additional losses.

(Def. Gerald's Br. in Supp. at 73.)

While it is clear that sometime from January to March 1990 Nick obtained sufficient information to put him on inquiry notice regarding Schwarzmann's actions, that date itself is not dispositive of the claims against Keiser and Gerald. The conspiracy between Schwarzmann and Keiser itself is not alleged to have begun until March 2, 1990. Schwarzmann's confessions about mafia dealings and illegal activity at that time concerned only his own actions, not those of Keiser, who had not yet (or had just recently, depending on the date of the Nick/Schwarzmann conversation) become a conspirator.

The question, then, is when did it become sufficiently apparent that Keiser and Gerald were assisting Schwarzmann. I believe that date is unclear enough to present a jury question. Nick may have known as of March 1990 that his nephew was a crook, but Schwarzmann had told Nick that the money was invested at and could be verified at Gerald: Beginning in April 1990, Schwarzmann was preparing phony Gerald statements—viewing the facts in plaintiffs' favor, Nick would have had no reason to suspect those statements were phony. Instead, they verified that his money was indeed at Gerald, although due to Schwarzmann's statements and name on the account the funds could not be accessed. Nick and his accountant then conducted some inquiries with Schwarzmann's attorney Doyle because the single name on the account was further suspicious activity. Yet again, the account information did not necessarily implicate Gerald. Instead, Doyle's letter was very reassuring—"this fund has been superbly profitable." (R. at 91 Ex. D.) Nick had no information at that time suggesting that Gerald knew Schwarzmann was improperly setting up the account under his own name. Perhaps the single name on the account should have tipped Nick off enough such that he contacted someone at Gerald about the problem. But, on the other hand, Eve during the summer of 1990 had called Keiser, and he had told her the investment was safe, confirming that although Schwarzmann had some problems with La Cosa Nostra, plaintiffs' money was nevertheless intact. Eve conveyed the results of her conversations with Keiser to Nick as follows: "[T]he fund was safe. Everything was fine. I shouldn't worry about it, and he doesn't have to worry about it." (R. at 91 Ex. T at 140.) Then, in March 1991, Keiser met with Eve and Frank Schwarzmann and confirmed via a Gerald statement that they indeed had $1.5 million in their account. While in hindsight it seems, perhaps, that Nick would have been smart to investigate more intensely Schwarzmann's financial maneuverings, I cannot say that as of March 1990 Nick necessarily knew enough to suspect Keiser and Gerald. He did conduct some inquiries, although perhaps meager,

in connection with Schwarzmann's pre-conspiracy conduct, but those inquiries merely indicated that his money was still safe. Taking the facts in plaintiffs' favor, as I must, a reasonable jury could find that Nick did not necessarily have enough information as of March 31, 1991 to suspect that the information he received from Keiser too was phony.

### 2. Negligent Misrepresentation and WOCCA Claims

■ Defendants contend that negligent misrepresentation claim has a three-year statute of limitations pursuant to Wis.Stat. § 893.54. Such a deadline would clearly not be met here because under Wisconsin's discovery rule, "tort claims shall accrue on the date the injury is discovered or with reasonable diligence should be discovered, whichever occurs first," [18] *Hansen v. A.H. Robins, Inc.*, 113 Wis.2d 550, 560, 335 N.W.2d 578 (1983), and it is undisputed that at the latest plaintiffs accrual date occurred in 1992 around the time when Schwarzmann was arrested.

■ Defendants' reliance on § 893.54 is misplaced, though. That section applies only to actions for "injuries to the person" and for "death caused by the wrongful act, neglect or default of another." Wis.Stat. § 893.54. Thus, it applies only to bodily injuries. *Acharya v. Carroll*, 152 Wis.2d 330, 337, 448 N.W.2d 275 (Ct.App.1989). Instead, the six-year limitations period for injuries to personal property, pursuant to Wis.Stat. § 893.52, applies to the negligent misrepresentation claim.

The WOCCA claim, which is asserted only against Gerald, also is subject to a six-year statute of limitations, Wis.Stat. § 946.88(1), and apparently the same discovery rule, as the parties do not dispute that the discovery rule applies, *cf. Hansen*, 113 Wis.2d at 560, 335 N.W.2d 578

(discovery rule adopted for all tort actions other than those already governed by a legislatively created discovery rule).

As stated above, whether the date on which Nick discovered the injury or else should have discovered it with reasonable diligence preceded March 31, 1991 is sufficiently unclear as to justify taking the issue to trial.

### D. Scope of Employment

■ Plaintiffs' claims against Gerald are based solely on the doctrine of respondeat superior, also known as vicarious liability. Under Wisconsin law, an employer is liable for acts of its employees while the employees are acting within the scope of their employment. *Cameron v. City of Milwaukee*, 102 Wis.2d 448, 456, 307 N.W.2d 164 (1981).The Wisconsin jury instruction on scope of employment best sums up the test:

A servant is within the scope of his or her employment when he or she is performing work or rendering services he or she was engaged to perform and render within the time and space limits of his or her authority and is actuated by a purpose to serve his or her master in doing what he or she is doing. He or she is within the scope of his or her employment when he or she is ... doing that which is warranted within the terms of his or her express or implied authority, considering the nature of the services required, the instructions which he or she has received, and the circumstances under which his or her work is being done or the services are being rendered.

A servant is outside the scope of employment when he or she deviates or steps aside from the prosecution of his or her master's business for the purpose of doing an act or rendering a service

---

18. The discovery rule carries with it the requirement that the plaintiff exercise reasonable diligence, which means such diligence as the great majority of persons would use in the same or similar circumstances. Plaintiffs may not close their eyes to means of information reasonably accessible to them and must in good faith apply their attention to those particulars which may be inferred to be within their reach.
*Stroh,* 177 Wis.2d at 103, 502 N.W.2d 132.

intended to accomplish an independent purpose of his or her own, or for some other reason or purpose, not related to the business of the master.

Such deviation or stepping aside must be sufficient to amount to a departure from the master's services for purposes entirely personal to him or her or for some person other than the master.

Such deviation or stepping aside from the master's business may be momentary and slight, measured in terms of space of time, but if it involves a change of mental attitude or purpose in serving his or her personal interests, or the interests of another, instead of his or her master's, his or her conduct falls outside the scope of his or her employment.

Wis. JI–Civil 4035 (1997). Thus, an employee generally is deemed to be acting within the scope of his or her employment unless there is a showing that his or her conduct is (1) different in kind from that authorized, (2) far beyond the authorized time or space limits, or (3) too little actuated by a purpose to serve the employer. *Scott v. Min–Aqua Bats Water Ski Club, Inc.,* 79 Wis.2d 316, 321, 255 N.W.2d 536 (1977) (citing Restatement (Second) of Agency § 228(2) (1957)).

■ Whether an employee was acting within the scope of his or her employment is usually presented to the jury because it entails factual questions on an employer's intent and purpose. *Block v. Gomez,* 201 Wis.2d 795, 804, 549 N.W.2d 783 (Ct.App. 1996). Thus, for a court to remove the question from a jury's consideration and rule as a matter of law that an employee's conduct falls outside the scope of employment, the evidence must support only that conclusion. *Id.* at 805, 549 N.W.2d 783.

Gerald contends that all of the claims against it must be dismissed because Keiser had no authority to commit fraud and was not furthering Gerald's business "by engaging in a conspiracy with Schwarzmann to defraud his family and friends." (Def. Gerald's Br. in Supp. at 50.) According to Gerald, it had internal policies and rules in place that forbid the deposit of money in an account in one name when the money belongs to others, the disclosure by a broker of a customer's account to third parties, and the supplying of blank Gerald stationery to anyone. Thus, if Keiser did these things he acted in violation of Gerald's rules. Gerald says it did not give Keiser any authority to assist Schwarzmann in covering up the fact that he had lost others' money or provide advice on how to conceal a fraud. Further, states Gerald, Keiser's actions created a potential for grave civil and criminal consequences and cost Gerald commissions. If Keiser had adhered to correct procedure and policy once he learned that Schwarzmann was investing others' money, he should have separated the money into individual accounts; Schwarzmann would not have been able to withdraw all of the money; and therefore Gerald would have earned additional commissions.

■ I note first that Gerald bases its argument upon the premise that Keiser's actions were intentional. Gerald does not address plaintiffs' alternate claim that even if Keiser did not intentionally conspire to commit fraud he nevertheless made injurious negligent misrepresentations to the plaintiffs. Nothing in the record before me convinces me that if, as alleged in claim three of the Amended Complaint, Keiser made negligent misrepresentations to the plaintiffs regarding the status of Schwarzmann's account at Gerald, such misrepresentations would have been outside the scope of his responsibilities as an account representative for Gerald. As a result, the motion for summary judgment on claim three on this ground will be denied.

■ Plaintiffs' conspiracy and WOCCA claims, however, both involve an intent to defraud plaintiffs and convert their money. Intentional torts may be held to be in the course of employment and create liability on the part of the employer. *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742,

——, 118 S.Ct. 2257, 2266, 141 L.Ed.2d 633 (1998).

> An employer may be liable for both negligent and intentional torts committed by an employee within the scope of his or her employment.... For example, when a salesperson lies to a customer to make a sale, the tortious conduct is within the scope of employment because it benefits the employer by increasing sales, even though it may violate the employer's policies.

*Id.* Nevertheless, " 'it is less likely that a willful tort will properly be held to be in the course of employment and that the liability of the master for such torts will naturally be more limited.' " *Id.* (quoting F. Mechem, *Outlines of the Law of Agency* § 394 (4th ed.1952)).

Gerald's policies and regulations against conduct like Keiser's alleged actions do not necessarily protect it. Even if the employer prohibited the act of the employee the employer can be vicariously liable if the employee acted within the scope of employment. *See State v. Beaudry,* 123 Wis.2d 40, 365 N.W.2d 593 (1985); *Bergman v. Hendrickson,* 106 Wis. 434, 435, 82 N.W. 304 (1900) ("It was his method of performing the duty delegated to him, and, although the method may not have been either expressly authorized or even contemplated,—nay, although it may have been expressly prohibited,—yet the master is liable for the damages caused thereby, provided he has intrusted to the servant the duty he was attempting to perform.").

Previous cases give some examples of conduct within or outside the scope of employment. In *Beaudry,* 123 Wis.2d 40, 365 N.W.2d 593, for instance, a tavern manager was found to have acted within the scope of employment when, against the instructions and policies of his employer, he served free drinks to two friends at the tavern after the legally required closing hour. In *Olson v. Connerly,* 151 Wis.2d 663, 445 N.W.2d 706 (Ct.App.1989), and *Olson v. Connerly,* 156 Wis.2d 488, 457 N.W.2d 479 (1990), however, the Wisconsin Court of Appeals and then the Wisconsin Supreme Court upheld a jury's findings that a doctor who had sexual contact with an employee-patient was performing medical treatment but not within the scope of his employment as a government physician, as the contact occurred on leisure hours at the patient's home; such acts were not common medical practice; and, because the patient was married, the act of sexual intercourse with her was a felony. Gerald points to *Harrison v. Dean Witter Reynolds, Inc.,* 974 F.2d 873 (7th Cir. 1992), as well. In that case a broker allowed a third party to invest money in the employee's personal account at Dean Witter, allowing the third party's money to be invested at the reduced commission allowed on employees' transactions. Dean Witter's rules prohibited use of an employee's account in this manner. The Seventh Circuit found that the broker and another employee assisting him had no authority to commit the fraud and were not seeking to benefit the employer; thus they acted outside the scope of employment. According to the court, there was no benefit to the employer because, "[w]hile it may be argued that Dean Witter received commissions on the activity Carpenter's account generated, it must be noted the commissions would have been greater had the activity been in a regular customer's account." *Id.* at 883 n. 5.

While this is a very close call, looking at the jury instruction and the factors set forth in *Scott* and taking all evidence in the light most favorable to plaintiffs, Gerald's motion for summary judgment in regard to the claims involving intent must be denied. First, Keiser's alleged actions were not necessarily different in kind from that authorized or far beyond authorized time or space limits. Keiser was authorized to solicit customers, open accounts and take in investments from them, which he was purporting to do for the plaintiffs. His alleged misrepresentations occurred during regular business hours while Keiser was at Gerald's Chicago office.

More importantly, it is not clear that Keiser was motivated by a purpose completely outside serving his employer. Gerald has yet to establish any personal benefit Keiser received or hoped to receive by assisting Schwarzmann—no cut of the money taken in by the Schimpfs, no returned favors by Schwarzmann. And it is not sufficiently clear that Keiser's aim was solely to assist Schwarzmann. Keiser indicated that he "always operated with Mr. Schwarzmann under the guise that he was going to refer large accounts to me, and a lot of business." (Keiser Dep. at 99–100.)[19] When Nick and Gorecki met with Keiser in Chicago, Keiser was hopeful that Schwarzmann was bringing someone to open an account, either on that day or in the future. (*See id.* at 96, 98.) "I was hopeful Mr. Schimpf was going to open an account with me and that was the reason that he was there." (Keiser Dep. at 104.) And Gerald did receive some commissions on the money that was actually invested by Schwarzmann, even if it was less than what Gerald possibly would have received otherwise.

> An employee
>
> may be found to have acted within the scope of his or her employment as long as the employee was at least partially actuated by a purpose to serve the employer. There is no requirement that serving the employer must be the employee's only purpose or even the employee's primary purpose. Rather, an employee's conduct is not within the scope of his or her employment if it is too little actuated by a purpose to serve the employer or if it is motivated entirely by the employee's own purposes (that is, the employee stepped aside from the prosecution of the employer's business to accomplish an independent purpose of his or her own).

*Olson,* 156 Wis.2d at 499–500, 457 N.W.2d 479. The law of vicarious liability imposes liability on the employer so long as the employee's "purpose, however, misguided,

is wholly or in part to further the master's business." W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 70 (5th ed.1984); *see* Wis. JI–Civil 4035 (the "deviation or stepping aside must be sufficient to amount to a departure from the master's services for purposes entirely personal to him or her or for some person other than the master"). I cannot say with conviction that the evidence supports only a conclusion that Keiser intended to act solely for his own benefit. I believe a reasonable jury could find otherwise. As a result, I will not remove the question from a jury's consideration. *See Block,* 201 Wis.2d at 805, 549 N.W.2d 783.

## VII. CONCLUSION

**THEREFORE, IT IS ORDERED** that Gerald's motion to exclude Keiser's deposition testimony is **DENIED IN PART** and **GRANTED IN PART** as set forth above.

**IT IS ORDERED** that Gerald's motion to exclude Nick Schimpf's testimony regarding Keiser's communications and transactions is **GRANTED** insofar as it relates to the September 20, 1991 meeting in Chicago and **DENIED WITHOUT PREJUDICE** as to any other communications or transactions.

**IT IS ORDERED** that Gerald's motion to exclude Michael Schwarzmann's testimony regarding Keiser's communications and transactions is **GRANTED.**

**IT IS ORDERED** that plaintiffs' request to strike the Magidson affidavit is **DENIED IN PART** and **GRANTED IN PART** as set forth above. Plaintiffs are allowed to depose Magidson prior to trial if they so choose.

**IT IS ORDERED** that in regard to the claims of plaintiffs previously dismissed from this case in January, both defendants' motions for summary judgment are **DENIED AS MOOT.**

---

**19.** I note that while I rely upon this statement now, it may not be admissible at trial because it does not appear to be a statement against interest.

**IT IS ORDERED** that the estate's motion for summary judgment is **DENIED** in regard to the statute of limitations issues.

**IT IS ORDERED** that Gerald's motion for summary judgment is **DENIED** to the extent it is based on an argument for Illinois law, in regard to the jurisdictional arguments on the claims of Bonnie Schimpf and Frank Schimpf, the statute of limitations matter, and the scope of employment issue.